IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:10-CV-154-D

JOHN D. MANLEY and )
KAREN MANLEY, )
            )
   Plaintiffs, )
            )
   v.       )    **ORDER**
            )
JOHN DOE, et al., )
            )
   Defendants. )

On June 30, 2010, plaintiffs John D. and Karen Manley ("Manleys" or "plaintiffs") filed a complaint against Wendy's International, Inc., ("Wendy's" or "defendant") and First Sun Management Corporation ("First Sun" or "defendant") (collectively, "defendants") in New Hanover County Superior Court [D.E. 1]. Not. of Removal, Ex. 2 ("State Court File") 14.[1] On August 9, 2010, defendants removed the case to this court based on diversity jurisdiction. On December 15, 2010, defendants sought judgment on the pleadings [D.E. 14]. Plaintiffs responded in opposition and sought leave to amend their complaint [D.E. 16, 18]. This court granted plaintiffs' motion to amend and denied defendants' motion for judgment on the pleadings as moot [D.E. 32]. On May 13, 2011, plaintiffs filed an amended complaint [D.E. 33]. In the amended complaint, John Manley seeks to recover for damages incurred as a result of defendants' alleged breach of an implied warranty of merchantability and negligence, and Karen Manley brings a derivative claim for loss of

---

[1] Plaintiffs also named John Doe, the manager of the Wendy's restaurant located at 350 South College Road, Wilmington, North Carolina, as a defendant in the original complaint. Id. ¶ 3. Upon removing the case to this court, defendants argued that Doe had been fraudulently joined. See Not. of Removal ¶¶ 10–12. Plaintiffs then abandoned their claims against Doe. See Am. Compl. ¶¶ 3–8.

consortium. Am. Compl. [D.E. 33] ¶¶ 35–49. The dispute arises out of a two-inch plastic fragment removed from John Manley's lung in September 2009. On May 27, 2011, defendants filed a motion to dismiss plaintiffs' amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure [D.E. 34] and a supporting memorandum [D.E. 35]. On June 17, 2011, plaintiffs responded in opposition [D.E. 41]. On November 15, 2011, defendants filed a motion for summary judgment [D.E. 44] and a supporting memorandum [D.E. 45]. On December 6, 2011, plaintiffs responded in opposition to defendants' summary judgment motion [D.E. 46]. As explained below, the court grants defendants' motion for summary judgment and denies as moot defendants' motion to dismiss.

I.

The Manleys are residents of New Hanover County, North Carolina. Am. Compl. ¶¶ 1–2; Manley Dep. [D.E. 44-8] 8. During February and March 2007, plaintiff John Manley purchased food from a Wendy's restaurant located at 350 South College Road, Wilmington, North Carolina ("restaurant"). Am. Compl. ¶ 22; Manley Dep. 128–29. First Sun owned the restaurant and operated it pursuant to a franchise agreement between First Sun and Wendy's. Am. Compl. ¶¶ 3, 7, 10; Defs.' Mem. Supp. Mot. Summ. J. [D.E. 45] 2. John Manley purchased and consumed food at the restaurant four or five times during February and March 2007. Manley Dep. 128–29. On these occasions, John Manley usually ordered, purchased, and consumed a single- or double-patty hamburger, garnished with cheese, tomatoes, pickles, onions, bacon, mayonnaise, and ketchup, a side order of french fries or onion rings, and a soft drink. Manley Dep. 144–47; Manley Resp. to Interrog. [D.E. 44-2] ¶¶ 19, 27. John Manley paid for his food with cash on each visit, and did not

2

retain receipts from his purchases. Manley Dep. 140–42.[2] During February and March 2007, John Manley did not consume food at any other Wendy's restaurant or any other fast food restaurant. Manley Dep. 84, 206; Manley Resp. to Interrog. ¶ 19. However, John Manley conceded that he occasionally ate at other non-fast food restaurants in Wilmington, North Carolina, during the relevant period. See Manley Resp. to Interrog. ¶ 25.

In the months after March 2007, plaintiff John Manley "experienced mild discomfort." Manley Dep. 90–100. This discomfort evolved into bouts of fatigue, coughing, and choking in mid-2007. Id. 90–94. John Manley first sought medical care for the coughing on September 14, 2007; however, doctors were unable to diagnose his symptoms for approximately two years. Manley Dep. 94–96; Gebrail Dep. [D.E. 44-6] 37–44.[3] During this period, John Manley also began to experience gastrointestinal problems. Manley Dep. 100–03. In July 2009, Dr. Momen M. Wahidi, an invertenvional pulmonologist at Duke University Medical Center performed a bronchoscopy of John Manley's lungs. Manley Dep. 96–97; Wahidi Dep. [D.E. 44-9] 14–17. The procedure revealed that a foreign object of approximately two inches in length was lodged in one of John Manley's lungs. Manley Dep. 94–97; Wahidi Dep. 14–16. In September 2009, Dr. Wahidi

---

[2] John Manley testified that he usually purchased lunch from the restaurant before or after shopping at stores in the shopping center adjacent to the restaurant. Manley Dep. 136. John Manley did not provide receipts or credit card statements supporting his claim that he ate at the restaurant during the relevant period. See Manley Resp. to Interrog. ¶ 22. However, John Manley did provide credit card statements that show that he made purchases at the Lowe's Home Improvement Warehouse adjacent to the restaurant during this period. Manley Dep. 140–41; Pls.' Mem. Opp'n Mot. Summ. J., Ex. 3 ("Manley Receipts").

[3] John Manley suffered a heart attack in June 2007. Manley Resp. to Interrog. ¶ 21; Manley Dep. 91. John Manley and his treating physicians originally thought that his coughing symptoms were related to his heart condition. Manley Dep. 91; Gebrail Dep. 22–23. However, John Manley and his treating physicians do not suggest that the plastic fragment caused John Manley's heart attack. See Manley Dep. 91; Gebrail Dep. 25–28.

3

surgically removed the object and identified it as a plastic fragment from an eating utensil. Wahidi Dep. 14–15; Manley Dep. 94–97. The fragment was embossed with a portion of the Wendy's logo. Defs.' Mot. Summ. J., Ex. 1 (photograph of the utensil fragment); Manley Dep. 155–56. John Manley's treating physician, Dr. Ayman Gebrail, concluded that the fragment caused the symptoms of which John Manley had first complained in 2007. See Gebrail Dep. 39–40. Dr. Wahidi agreed with Dr. Gebrail's diagnosis. See Wahidi Dep. 35–36.

Plaintiffs contend that John Manley "unknowingly ingested said plastic fragment" while consuming "a Wendy's loaded hamburger sandwich that he had purchased from the Wendy's located at 350 South College Road, Wilmington, North Carolina." Am. Compl. ¶ 29; see Manley Resp. to Interrog. ¶ 19. They claim that on one of John Manley's February or March 2007 visits to the restaurant, he ordered a sandwich, that restaurant employees prepared the sandwich in the kitchen area of the restaurant, that the sandwich contained the utensil fragment, and that he unknowingly consumed the fragment while eating the sandwich, causing the fragment to become lodged in his lung. Am. Compl. ¶ 24; Manley Resp. to Interrog. ¶ 19. Plaintiffs reach this conclusion through circumstantial reasoning. See Am. Compl. ¶ 24; Manley Resp. to Interrog. ¶ 19. First, John Manley testified that the presence of the Wendy's logo on the fragment indicated that the fragment came from a Wendy's restaurant and entered his lung while he was consuming food purchased from the restaurant. Manley Dep. 154. John Manley then stated that he was certain that he would have noticed the fragment had it been in his drink, which he consumed with a straw. Id. 148. He stated that he would have also noticed the fragment had it been in a french fry or onion ring, which he consumed with his hands. Id. 157. Therefore, John Manley concluded that the fragment must have been in one of the sandwiches that he purchased, which he consumed by hand, taking large bites. Id. 157–61; Manley Resp. to Interrog. ¶ 19.

4

Plaintiffs allege that the symptoms that John Manley suffered as a result of the plastic fragment being lodged in his lung caused him to incur substantial medical expenses, and he anticipates incurring additional expenses related to future treatment. Am. Compl. ¶ 32. Additionally, John Manley alleges that he has suffered pain and discomfort, preventing him from performing his normal activities and employment obligations. Id. ¶ 33.

Plaintiffs raise three claims, all under North Carolina law. First, John Manley alleges that defendants breached their implied warranty of merchantability associated with the sale of food from defendants to John Manley. Id. ¶¶ 35–44. John Manley claims that the good sold to him by defendants (a sandwich in February or March 2007) was not merchantable at the time of sale because of the undisclosed presence of the plastic fragment. Id. ¶¶ 41–42. Second, John Manley claims that defendants were negligent in preparing and selling food containing the plastic fragment, and that this negligence was the direct and proximate cause of his injuries. Id. ¶¶ 45–46. Third, Karen Manley claims loss of consortium, alleging that before John Manley's injuries, the Manleys enjoyed a happy marriage, and that since his injuries, John Manley has not been able to "function in his full capacity as a marriage partner" to Karen Manley. Id. ¶¶ 48–49. Defendants seek summary judgment as to all of plaintiffs' claims. See Defs.' Mot. Summ. J. 1–2.

II.

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 325. After the moving party has met this burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for

5

trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A genuine dispute about a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The court views the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

A.

Under North Carolina law, a plaintiff may base a products liability action on a breach of a contractual warranty. N.C. Gen. Stat. Ann. § 99B-1.2. North Carolina's version of the Uniform Commercial Code states that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Id. § 25-2-314. The statute states that "serving for value of food or drink to be consumed either on the premises or elsewhere is a sale." Id. The statute further states that goods are merchantable when they, inter alia, "are fit for the ordinary purposes for which such goods are used . . . ." Id.

> To establish a breach of implied warranty of merchantability under the statute, a plaintiff must prove the following elements: (1) that the goods bought and sold were subject to an implied warranty of merchantability; (2) that the goods did not comply with the warranty in that the goods were defective at the time of sale; (3) that his injury was due to the defective nature of the goods; and (4) that damages were suffered as a result.

DeWitt v. Eveready Battery Co., Inc., 355 N.C. 672, 683, 565 S.E.2d 140, 147 (2002) (quotations omitted); see Goodman v. Wenco Foods, Inc., 333 N.C. 1, 10, 423 S.E.2d 444, 447–48 (1992); Morrison v. Sears, Roebuck & Co., 319 N.C. 298, 301, 354 S.E.2d 495, 497 (1987); Rose v. Epley Motor Sales, 288 N.C. 53, 59–60, 215 S.E.2d 573, 577 (1975).

Defendants seek summary judgment as to John Manley's breach of implied warranty claim because John Manley has not brought forward sufficient evidence to prove that defendants sold John

6

Manley a defective product. Defs.' Mem. Supp. Mot. Summ. J. 6–14. Defendants make a two-part argument. First, they argue that John Manley has not identified the specific hamburger that allegedly contained the plastic fragment. Id. 7–8. They note that John Manley has admitted that he does not recall ingesting the plastic fragment. Id. 8; see Manley Dep. 143, 156–57. Second, defendants argue that because John Manley has not identified a specific good, he cannot prove that any good was defective at the time of sale. Defs.' Mem. Supp. Mot. Summ. J. 8–14.

No North Carolina appellate court appears to have addressed whether a plaintiff must prove the existence of a specific good when claiming breach of an implied warranty of merchantability. Moreover, neither party has cited North Carolina appellate cases that support their respective arguments on this issue. See Defs.' Mem. Supp. Mot. Summ. J. 9–11; Pls.' Mem. Opp'n Mot. Summ. J. 11–20. Sitting in diversity, the court must predict how the Supreme Court of North Carolina would rule on this issue. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must not "create or expand [North Carolina] public policy." Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (quotations omitted).

The Supreme Court of North Carolina held in Dewitt that a plaintiff alleging breach of an implied warranty of merchantability must establish "that the goods did not comply with the warranty in that the goods were defective at the time of sale." 355 N.C. at 683, 565 S.E.2d at 147. In DeWitt, the plaintiff identified with particularity a specific good when claiming breach of an implied warranty of merchantability. See id. at 690, 565 S.E.2d at 151 (identifying two batteries that leaked). Moreover, the court has not located (and plaintiffs have not cited) a North Carolina appellate decision permitting a breach of warranty claim to go to a jury where a plaintiff failed to identify with

7

particularity a specific good when claiming breach of an implied warranty of merchantability.[4] Therefore, to permit John Manley's claim in this case to go forward would impermissibly expand North Carolina public policy. See Time Warner, 506 F.3d at 314.

Alternatively, assuming that John Manley is not required to prove a specific defective good, his breach of implied warranty of merchantability claim still fails because he has not presented sufficient evidence to prove that a defect in a hamburger that defendants sold to him in February or March 2007 caused his injuries. In DeWitt, the Supreme Court of North Carolina held that a plaintiff claiming breach of implied warranty of merchantability may use circumstantial evidence to establish that the product at issue was defective at the time of sale. 355 N.C. at 689, 565 S.E.2d

---

[4] The court has reviewed numerous North Carolina appellate cases that involved claims for breach of implied warranty of merchantability. In each of the cases reviewed, the plaintiffs alleged with particularity and presented proof of a specific defective product. See Goodman, 333 N.C. at 9–17, 423 S.E.2d at 447–52 (hamburger); Morrison, 319 N.C. at 301–02, 354 S.E.2d at 497–98 (shoe); Rose, 288 N.C. at 60–61, 215 S.E.2d at 577–78 (car); Evans v. Evans, 153 N.C. App. 54, 61, 569 S.E.2d 303, 307–08 (2002) (clamp on irrigation system); Red Hill Hosiery Mill, Inc. v. MagneTek, Inc.(Red Hill I), 138 N.C. App. 70, 71–74, 530 S.E.2d 321, 325–26 (2000) (florescent light fixture), appealed after remand, Red Hill Hosiery Mill, Inc. v. MagneTek, Inc.(Red Hill II), 159 N.C. App. 135, 136–37, 582 S.E.2d 632, 634 (2003); Nicholson v. Am. Safety Util. Corp., 124 N.C. App. 59, 68–69, 476 S.E.2d 672, 678 (1996), aff'd as modified by 346 N.C. 707, 488 S.E.2d 240 (1997) (gloves); Simpson v. Hatteras Island Gallery Rest., Inc., 109 N.C. App. 314, 317–18, 427 S.E.2d 131, 134 (1993) (tuna); Ismael v. Goodman Toyota, 106 N.C. App. 421, 430–32, 417 S.E.2d 290, 295–96 (1992) (car); Gregory v. Atrium Door & Window Co., 106 N.C. App. 142, 142–44, 415 S.E.2d 574, 574–75 (1992) (door); Chandler v. U-Line Corp., 91 N.C. App. 315, 319–21, 371 S.E.2d 717, 719–21 (1988) (valve); Holland v. Edgerton, 85 N.C. App. 567, 572–73, 355 S.E.2d 514, 518 (1987) (mausoleum); Wright v. T&B Auto Sales, Inc., 72 N.C. App. 449, 454, 325 S.E.2d 493, 496 (1985) (car); So. of Rocky Mount, Inc. v. Woodward Specialty Sales, Inc., 52 N.C. App. 549, 551–56, 279 S.E.2d 32, 33–37 (1981) (air compressor); Maybank v. S.S. Kresge Co., 46 N.C. App. 687, 690–93, 266 S.E.2d 409, 411–13 (1980), aff'd as modified by 302 N.C. 129, 273 S.E.2d 681 (1981) (flashcube); Cockerham v. Ward, 44 N.C. App. 615, 623–25, 262 S.E.2d 651, 658 (1980) (rubber strap); Reid v. Eckerds Drugs, Inc., 40 N.C. App. 476, 485–87, 253 S.E.2d 344, 350–51 (1979) (aerosol deodorant can); Coffer v. Standard Brands, Inc., 30 N.C. App. 134, 138–42, 266 S.E.2d 534, 536–39 (1976) (bottle of peanuts); Burbage v. Atl. Mobilehome Suppliers Corp., 21 N.C. App. 615, 617–18, 205 S.E.2d 622, 623–24 (1974) (trailer hitch); Gillispie v. Great Atl. & Pac. Tea Co., 14 N.C. App. 1, 6, 187 S.E.2d 441, 444–45 (1972) (bottled soft drink).

at 151 ("[T]he burden . . . may be met if the plaintiff produces adequate circumstantial evidence of a defect."). Although a plaintiff may prove the existence of a defect with circumstantial evidence, a plaintiff may not "stack[] inference upon inference" when making a prima facie products liability case. Carlton v. Goodyear Tire & Rubber Co., 413 F. Supp. 2d 583, 588 (M.D.N.C. 2005); accord Red Hill I, 138 N.C. App. at 77 n.7, 530 S.E.2d at 327 n.7. "Such stacking . . . would result in strict liability for product failure." Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc., No. 5:06-CV-160-D, 2011 WL 1262159, at *6 (E.D.N.C. Mar. 31, 2011) (construing North Carolina law), appeal pending, No. 11-1427 (4th Cir. May 3, 2011). North Carolina, however, does not recognize strict liability in products liability actions, N.C. Gen. Stat. Ann. § 99B-1.1, and a claim for breach of an implied warranty of merchantability is a products liability claim. See N.C. Gen. Stat. Ann. § 99B-1.2; DeWitt, 355 N.C. at 682, 565 S.E.2d at 146.

To use circumstantial evidence to prove that a sandwich sold to John Manley in February or March 2007 was defective at the time of sale, John Manley first must show that the fragment that Dr. Wahidi removed from his lung in September 2009 came from the restaurant at 350 South College Road, Wilmington, North Carolina. Although the fragment included the Wendy's logo, the logo's presence on the fragment is merely circumstantial evidence that the defect originated in a Wendy's restaurant. It is not circumstantial evidence that it originated in the Wendy's restaurant located at 350 South College Road. Nonetheless, John Manley then seeks to use his own testimony about where he ate in February and March 2007 and couple that testimony with the logo to infer that the fragment came from the Wendy's on 350 South College Road. John Manley then seeks to establish more inferences—that a sandwich sold to him by defendants and prepared at the restaurant in February or March 2007 must have contained the fragment at the time of sale and that he must have unknowingly ingested it while eating at the restaurant. Although these are possible inferences, they

are distinct inferences and John Manley seeks to stack them atop each other in order to prove the existence of a product defect.

In DeWitt, the court identified six factors relevant in determining whether a plaintiff has adequately established the existence of a product defect through circumstantial evidence. See 355 N.C. at 689–90, 565 S.E.2d at 151. The factors that the court identified were:

> (1) the malfunction of the product; (2) expert testimony as to a possible cause or causes; (3) how soon the malfunction occurred after the plaintiff first obtained the product and other relevant history of the product . . . ; (4) similar incidents, when accompanied by proof of substantially similar circumstances and reasonable proximity in time; (5) elimination of other possible causes of the accident; and (6) proof tending to establish that such an accident would not occur absent a manufacturing defect.

Id., 565 S.E.2d at 151 (quotations and citations omitted). Thus, this court examines John Manley's evidence in light of the six DeWitt factors.

First, the court must examine the malfunction of the product. As mentioned, John Manley seeks to stack inference, upon inference, upon inference to prove the malfunction of an unidentified hamburger. The sole piece of physical evidence on which he relies for the multitude of inferences is the plastic fragment found in his lung over two years after he ate at the restaurant. In analyzing the first DeWitt factor, the court notes that John Manley's evidence on the first DeWitt factor contrasts sharply with the plaintiff's evidence in DeWitt. In DeWitt, the plaintiff purchased batteries in a package. Id. at 674–75, 565 S.E.2d at 142. The plaintiff read the instructions concerning how to insert the batteries in a lantern and inserted them. Id. at 675, 565 S.E.2d at 142. He then tested the lantern on that date. Id., 565 S.E.2d at 142. Within twenty-four hours of purchasing the batteries, he removed the batteries from the lantern. Id., 565 S.E.2d at 142. Although the batteries were brand new and used for a minimal time, they leaked and caused injury to the plaintiff's skin. Id., 565 S.E.2d at 142. On this evidence, the Supreme Court of North Carolina held that the plaintiff

10

had raised a genuine issue of material fact concerning whether the batteries malfunctioned. See id. at 689–90, 565 S.E.2d at 151. The plaintiff's circumstantial evidence of product malfunction in DeWitt did not stack inference, upon inference, upon inference. Thus, John Manley has failed to establish the first DeWitt factor, the malfunction of a product.

Second, the court considers the expert testimony proffered by the parties. See DeWitt, 355 N.C. at 687, 565 S.E.2d at 149. John Manley offers his treating physicians, Dr. Wahidi and Dr. Gebrail, as experts in pulmonology, who are qualified to testify that the plastic fragment caused John Manley's symptoms. Pls.' Mem. Opp'n Mot. Summ. J. 14–15. Although the doctors' testimony would be based on their respective medical training and expertise, their statements would not be expert testimony as to possible causes of the malfunction of the product.[5] Rather, the testimony would relate to John Manley's treatment and possible causes for his symptoms. Therefore, John Manley has not brought forward expert testimony under this DeWitt factor.

In contrast, defendants have presented the testimony of two expert witnesses to rebut the notion that the plastic fragment found in John Manley's lung originated in a defective sandwich sold and consumed in the restaurant in February or March 2007. See Defs.' Expert Disclosure [D.E. 44-3]. These witnesses provide relevant testimony regarding other possible causes for John Manley's injury. Dr. Robert M. Arias opined that "[t]he only way for a person to unknowingly inhale an object

---

[5] When applying this DeWitt factor, courts have considered expert testimony as to possible causes of a product's malfunction, rather than expert testimony as to possible causes of a plaintiff's injury. See, e.g., DeWitt, 355 N.C. at 690–91, 565 S.E.2d at 151 (discussing plaintiff's expert testimony explaining the batteries' leakage); Red Hill II, 159 N.C. App. at 140, 582 S.E.2d at 636 (discussing dispute between expert witnesses as to the cause of the product's malfunction); Evans, 153 N.C. App. at 61, 569 S.E.2d at 308 (plaintiff's expert testified as to whether the clamp at issue met the industry custom or standard and was merchantable); cf. Carlton, 413 F. Supp. 2d at 590–91 ("For the second factor, a plaintiff may present expert testimony concerning the variety of possible causes of the malfunction . . . .").

like the utensil fragment at issue is to have a severe mental status depression (due to intoxication or other problems) to the point that the coughing reflex is suppressed." Id. 4. Accordingly, Dr. Arias concluded that it was most likely that the plastic fragment entered John Manley's lung while John Manley was intoxicated. Id. Dr. Arias emphasized that the failure to find food particles in the lung when the doctors removed the plastic fragment, as should have been present had the plastic fragment entered the lung while John Manley was eating a sandwich, bolstered his conclusion. Id. Dr. Arias explained that the lungs do not have the enzymes found in the stomach that allow the stomach to break down food. Id. Therefore, if food particles had entered John Manley's lung at the same time as the fragment, as would have occurred under John Manley's theory of the case, those particles should still have been observable when doctors removed the plastic fragment in 2009. Id. Dr. Mitchell S. Collman reached the same conclusion, noting that it was unlikely that John Manley "would have both inhaled the fragment into his lung and not known about it if [his gag and cough reflexes] had been intact." Id. 8. He concluded that it was most likely that alcohol intoxication caused the suppression of John Manley's gag and cough reflexes. Id. Both doctors based their opinions in part on John Manley's insistence that he was never intoxicated or impaired while eating at Wendy's in February or March 2007, see Manley Dep. 209, and the evidence of John Manley's alcohol and cocaine abuse at different periods of his life (including during 2007). See Def.'s Expert Disclosure 4–5, 8–9.[6] Accordingly, this DeWitt factor does not support John Manley's claim.

---

[6] Dr. Wahidi, John Manley's treating physician, testified that John Manley's medical records indicated a history of alcohol abuse. Wahidi Dep. 86. However, John Manley denied that his consumption of alcohol ever rose to the level of abuse. Manley Dep. 123. He stated that he consumed only beer and vodka, and that in 2007, he consumed vodka only once or twice a month and consumed about four beers at a time at least two days a week. Id. 123–25. John Manley also admitted to using cocaine intermittently over the past three decades, and that in June 2007, he was consuming approximately an eighth of a gram of cocaine twice a week. Id. 118. Finally, John Manley admitted to consuming marijuana since 2007. Id. 126.

12

John Manley failed to address the third <u>DeWitt</u> factor, "the timing of the malfunction in relation to when the plaintiff first obtained the product." See 355 N.C. at 687, 565 S.E.2d at 149–50. Apparently, however, John Manley contends that the unidentified hamburger malfunctioned immediately after he purchased it, ate it, and unknowingly ingested the plastic fragment. As mentioned, in support of this contention, John Manley stacks inference, upon inference, upon inference. Thus, this <u>DeWitt</u> factor does not support John Manley's claim.

Fourth, John Manley argues that he has proven "the occurrence of similar accidents involving the same product." Pls.' Mem. Opp'n Mot. Summ. J. 15–16; see <u>DeWitt</u>, 355 N.C. at 687–88, 565 S.E.2d at 149. Specifically, John Manley argues that defendants' restaurants frequently serve food containing foreign objects. Pls.' Mem. Opp'n Mot. Summ. J. 15–16. He cites a list of all of the complaints of foreign objects in food that defendant, First Sun, received from customers of its restaurants between 2007 and 2009. <u>Id.</u> The list includes twenty-one customer complaints. <u>Id.</u> However, none of the incidents that John Manley cites involved fragments from a plastic eating utensil. See <u>id.</u> Moreover, most did not involve injury to the complaining customer. See <u>id.</u> In fact, Joseph Turner, the CEO of defendant, First Sun, testified that in his thirty years of work in the fast food industry, he knew of no instance in which a restaurant sold food containing a fragment from a plastic eating utensil. Turner Dep. [D.E. 44-7] 5, 56–60. Turner explained that most of the foreign objects found in the reported incidents either were contained in ingredients purchased by Wendy's and manufactured by third parties or entered the food items after purchase by the customers. <u>Id.</u> 40–43, 55. Turner stated that he was certain that none of the plastic pieces that customers had found in food sold at one of First Sun's restaurants had been from a plastic eating utensil. <u>Id.</u> 57. Moreover, Turner testified that between 2007 and 2009, First Sun's fifty-one restaurants served

13

approximately 36 million customers, and only twenty-one of those customers reported finding any foreign object in their purchased food. Id. 44, Ex. 4.

Despite John Manley's statement that "customers have complained of similar incidents," the cited incidents are not substantially similar and do not make it more likely that defendants breached their implied warranty to John Manley. Cf. DeWitt, 355 N.C. at 689–90, 565 S.E.2d at 151. To the contrary, the record demonstrates that the incident that John Manley alleges occurred to him does not happen often in the fast food industry and did not happen between 2007 and 2009 in one of defendants' restaurants. In each of the instances cited on the list, the complaining customers reported finding the foreign objects in their food items while consuming the food. Therefore, John Manley's argument that foreign objects are mistakenly placed in food at defendants' restaurants with regularity implies that customers find these foreign objects in their food when such objects are present. This premise, then, undercuts the crucial factual allegation in plaintiffs' case—that John Manley consumed the two-inch plastic fragment from an eating utensil without becoming aware of the fragment's presence in his hamburger. Thus, this DeWitt factor does not support John Manley's claim.

Finally, John Manley has not presented evidence eliminating other possible causes of the accident. See DeWitt, 355 N.C. at 688, 565 S.E.2d at 150.[7] John Manley testified that he was confident that he consumed the fragment while eating a hamburger in the restaurant in February or March 2007 because he would have noticed the fragment had it been in a french fry, onion ring, or

---

[7] John Manley appears to concede this point, arguing only that he is not obligated, under DeWitt, to make a showing on this factor. See Pls. Mem. Opp'n Mot. Summ. J. 17. Although DeWitt supports John Manley's argument that failure to disprove alternative causes is not, by itself, a basis for rejecting his claim, a failure to make a showing on this factor is relevant to determine whether a reasonable jury could find that John Manley can prove an implied warranty breach through the circumstantial evidence that he has mustered. See 355 N.C. at 694, 565 S.E.2d at 154.

14

his beverage. Manley Dep. 157. He further opined that he consumed the fragment while eating a hamburger in the restaurant because the restaurant was the only Wendy's at which he purchased food during the relevant period, and the Wendy's logo on the fragment confirms that it came from a Wendy's restaurant. See id. 84. Defendants suggest, however, that John Manley's hypothesis fails to take into account the plausibility that the plastic fragment from the eating utensil entered John Manley's lung outside of a Wendy's restaurant. Defs.' Mem. Supp. Mot. Summ. J. 14. They note that all of the restaurants operated by First Sun have freely available plastic utensils in their dining areas, and customers frequently take these utensils and use them in places other than Wendy's restaurants. Id.; see Turner Dep. 57–58. Defendants reason that it is plausible that the fragment came from a plastic utensil carried away from a Wendy's restaurant, and that it entered John Manley's lung while he was engaged in some activity other than eating food at the restaurant. Id. In support of their alternative hypothesis, defendants again offer the expert testimony of Dr. Arias and Dr. Collman.

Having considered the relevant DeWitt factors, the court concludes that no reasonable jury could find that a defect in a hamburger that defendants sold to John Manley in February or March 2007 caused his injuries. In doing so, the court heeds the admonition that the Supreme Court of North Carolina made in DeWitt concerning the need for a trial judge to carefully review the evidence where a person relies on a "malfunction principle," because "small variations in facts" can lead to "diametrically opposite results." 355 N.C. at 695, 565 S.E.2d at 154. Here, to allow John Manley's claim to go to a jury would lead to a result whereby he essentially seeks recovery based on the fragment removed in September 2009, without evidence that a hamburger was defective at the time of sale in February or March 2007. Such a result would essentially be a res ipsa loquitur theory. However, under North Carolina law, a plaintiff cannot use res ipsa loquitur to establish liability for

15

ingesting allegedly adulterated food. See, e.g., Jones v. GMRI, Inc., 144 N.C. App. 558, 566, 551 S.E.2d 867, 873 (2001), cert. dism. as improvidently granted, 355 N.C. 275, 559 S.E.2d 787 (2002); cf. N.C. Gen. Stat. Ann. § 25-2-314.

Sitting in diversity, this court may not create or expand North Carolina public policy. See Time Warner, 506 F.3d at 314. By disclaiming strict liability in products-based torts, see N.C. Gen. Stat. Ann. § 99B-1.1, and rejecting res ipsa loquitur in cases arising from ingesting allegedly adulterated food, see Jones, 144 N.C. App. at 566, 551 S.E.2d at 873, North Carolina's legislature and courts have expressed their unwillingness to permit a claim like John Manley's breach of implied warranty of merchantability claim to go to a jury. Accordingly, the court grants defendants' motion for summary judgment as to John Manley's breach of implied warranty of merchantability claim.

B.

John Manley also alleges that defendants were negligent in preparing and selling the food that caused John Manley's injury. Am. Compl. ¶¶ 45–47. He claims that defendants were negligent in (1) preparing and offering "for sale and for human consumption food which contained a foreign object likely to cause injury to a consumer . . . ."; (2) failing "to inspect with proper care . . . their food products . . . with careless and reckless disregard to the rights and safety of [p]laintiff, John D. Manley"; (3) failing "to act with ordinary care in the preparation and production of the food they served to the public . . . "; and (4) failing "to otherwise uphold their legal responsibilities and duties to their patrons to ensure that their food products were reasonably safe . . . ." Id. ¶ 46.

North Carolina law requires that a plaintiff bringing a products liability action based on negligence prove "(1) the product was defective at the time it left the control of the defendant, (2) the defect was the result of the defendant's negligence, and (3) the defect proximately caused

16

plaintiff damage." Red Hill I, 138 N.C. App. at 75, 530 S.E.2d at 326. A plaintiff may establish the first element inferentially by presenting "evidence of the product's malfunction, if there is evidence that the product had been put to its ordinary use." Id. at 76–77, 530 S.E.2d at 327. A plaintiff may establish the second element through circumstantial evidence as well, but only if the plaintiff has first proven the existence of the defect using direct evidence. Id. at 75, 530 S.E.2d at 326 ("An inference of manufacturer's negligence arises upon proof of an actual defect in the product."). However, a plaintiff may not use circumstantial evidence to establish both the existence of the defect and the fact that the defect resulted from defendant's negligence. Id. at 77 n.7, 530 S.E.2d at 327 n.7; see also Farrar & Farrar, 2011 WL 1262159, at *5 ("[A] plaintiff who relies on indirect evidence to prove the first element (i.e., product defect) may not also rely on an inference to prove the second element (i.e., negligence)."); Carlton, 413 F. Supp. 2d at 588 ("[A] plaintiff may not prove negligence by stacking inference upon inference."). Therefore, if a plaintiff lacks direct evidence of a product defect, the plaintiff must present direct evidence to show that the defendant failed to exercise "reasonable care throughout the manufacturing process." Red Hill I, 138 N.C. App. at 75, 530 S.E.2d at 326; see also Farrar & Farrar, 2011 WL 1262159, at *5 (collecting cases).

John Manley impermissibly seeks to establish both the existence of the defect and defendants' negligence through indirect evidence. See Carlton, 413 F. Supp. 2d at 588. As discussed in reference to John Manley's breach of implied warranty of merchantability claim, John Manley relies on indirect evidence to establish the existence of a product defect. Discovery of the fragment in John Manley's lung more than two years after an alleged sale of an allegedly defective sandwich is not direct evidence that a sandwich sold to John Manley was defective at the time of sale. See State v. Wright, 275 N.C. 242, 249–50, 166 S.E.2d 681, 686 (1969) ("Direct evidence is that which is immediately applied to the fact to be proved . . . ."); see also Fed. Jury Practice &

17

Instructions § 101.42 ("Direct evidence is direct proof of a fact, such as testimony by a witness about what the witness said or heard or did."). Therefore, to survive defendants' motion for summary judgment, John Manley must offer evidence to prove defendants' negligence in some manner other than indirect proof. Cf. Farrar & Farrar, 2011 WL 1262159, at *5.

In the amended complaint, John Manley alleges four grounds for finding defendants negligent. See Am. Compl. ¶ 46. John Manley does not provide supporting facts or evidence for two of these grounds—that defendants failed to use proper care in inspecting the food that they sold and that defendants failed to use ordinary care in preparing and producing the food for sale. See id. Such unsupported allegations of negligence are insufficient to raise a genuine issue of a material fact. See, e.g., Anderson, 477 U.S. at 248.

John Manley also claims that the fact that defendants "prepared and offered for sale . . . food which contained a foreign object likely to cause injury to a consumer" establishes defendants' negligence. However, John Manley fails to allege any specific negligent act other than the foreign object itself. Essentially, the court construes this allegation as a res ipsa loquitur claim. See Howie v. Walsh, 168 N.C. App. 694, 698, 609 S.E.2d 249, 251 (2005) (discussing the doctrine of res ipsa loquitur). As mentioned, in North Carolina, "the doctrine of res ipsa loquitur does not apply in a case involving an injury from the ingestion of an adulterated food product." Jones, 144 N.C. App. at 566, 551 S.E.2d at 873 (res ipsa loquitur did not allow plaintiff to establish defendant's negligence based on her discovery of a metal fragment in a meatball); see Coffer, 30 N.C. App. at 136–37, 226 S.E.2d at 536.[8]

---

[8] John Manley seeks to distinguish this case from Jones, arguing that unlike that case, "[t]he facts of this case do not deal with sealed foods . . . ." Pls.' Mem. Opp'n Mot. Summ. J. 9. However, the court in Jones did not suggest that the rule articulated is limited to sealed food. See Jones, 144 N.C. App. at 566, 551 S.E.2d at 873.

18

Finally, John Manley asserts that defendants were negligent in failing "to uphold their legal responsibilities and duties to their patrons to ensure that their food products were reasonably safe for human consumption." Am. Compl. ¶ 46. Although not stated explicitly, this claim appears to rely on the doctrine of negligence per se. See Lutz Indus. v. Dixie Home Stores, 242 N.C. 332, 341, 88 S.E.2d 333, 339 (1955) (discussing the doctrine of negligence per se). The "legal responsibilities" that John Manley mentions in the amended complaint apparently are those in the North Carolina Pure Food, Drug, and Cosmetic Act. See N.C. Gen. Stat. Ann. §§ 106-121, et seq. The North Carolina Pure Food, Drug, and Cosmetic Act prohibits the sale of "any food . . . that is adulterated or misbranded." Id. § 106-122. A food item is considered adulterated when "it bears or contains any poisonous or deleterious substance which may render it injurious to health . . . ." Id. § 106-129(1)(a). John Manley appears to claim that when defendants sold him a sandwich containing a two-inch plastic fragment defendants thereby violated the statute and that violation constitutes negligence per se. Cf. Am. Compl. ¶ 46.

The Supreme Court of North Carolina has held that because the statute and the accompanying state regulations do not impose a standard of care for compliance, a violation of the Pure Food, Drug, and Cosmetic Act cannot serve as a basis for finding a defendant negligent per se. See Goodman, 333 N.C. at 18–19, 423 S.E.2d at 452–53 (holding that defendant-restaurant was not negligent per se when it sold plaintiff a hamburger that contained a bone fragment); see also Jones, 144 N.C. App. at 566, 551 S.E.2d at 873. Thus, this argument fails.

In sum, John Manley has not raised a genuine issue of material fact regarding his negligence claim. Accordingly, the court grants defendants' motion for summary judgment as to John Manley's negligence claim. In light of this conclusion, the court does not address defendants' arguments concerning contributory negligence.

19

C.

Finally, plaintiffs seek to recover for Karen Manley's loss of consortium when John Manley became unable to "function in his full capacity as a marriage partner" due to his injuries. Am. Compl. ¶¶ 48–49. Karen Manley's loss of consortium claim derives from John Manley's breach of implied warranty of merchantability and negligence claims. See Stokes v. Se. Hotel Props., Ltd., 877 F. Supp. 986, 1000 (W.D.N.C. 1994) ("[A] cause of action for loss of consortium is derivative in the sense that it is occasioned by injury to the spouse through negligence of another."). A derivative claim must be dismissed when the claims from which it was derived are dismissed. See, e.g., King v. Cape Fear Mem'l Hosp., Inc., 96 N.C. App. 338, 342, 385 S.E.2d 812, 814 (1989). Because the court has granted summary judgment to defendants on John Manley's two primary claims, the court also grants defendants' motion for summary judgment as to Karen Manley's loss of consortium claim.

III.

Plaintiffs have failed to raise a genuine issue of material fact regarding any of their claims. Accordingly, the court GRANTS defendants' motion for summary judgment [D.E. 44], and DENIES as moot defendants' motion to dismiss [D.E. 34]. The clerk shall close the case.

SO ORDERED. This 2 day of February 2012.

JAMES C. DEVER III
Chief United States District Judge